United States District Court
Southern District of Texas
**ENTERED**
September 16, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| JOHN FRANKLIN BELL, JR., TDCJ #02153737, | § § § | |
| Petitioner, | § § | |
| VS. | § § | CIVIL ACTION NO. H-21-01961 |
| BOBBY LUMPKIN-DIRECTOR TDCJ-CID, | § § § | |
| Respondent. | § § | |

## MEMORANDUM AND ORDER

Petitioner John Franklin Bell, Jr. (TDCJ #02153737) is a state inmate incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division (TDCJ). Bell, represented by counsel, filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge his conviction and sentence for continuous sexual abuse of a child under fourteen. Doc. No. 1 (Petition). Respondent filed a motion for summary judgment, Doc. No. 6, and Bell filed a response in opposition, Doc. No. 7. The Court has carefully considered the pending motion, response, record, and applicable law, GRANTS Respondent's motion for summary judgment, and DISMISSES this petition with prejudice for the reasons that follow.

## I.   BACKGROUND AND PROCEDURAL HISTORY

Bell was convicted of continuous sexual abuse of a child under fourteen after a jury trial in the 506th Judicial District Court of Waller County, Texas, in cause number 14-12-14933.[1]  He is serving a 55-year sentence, without the possibility of parole, as a result of that conviction.[2]  The state intermediate appellate court affirmed his conviction on appeal. *See Bell v. State*, No. 01-17-00811-CR, 2019 WL 1560855 (Tex. App.—Houston [1st Dist.] Apr. 11, 2019, pet. ref'd).  The Texas Court of Criminal Appeals refused his petition for discretionary review on June 19, 2019.  *Id.*  The Texas intermediate court of appeals summarized the background facts as follows:

> Bell became R.M.'s stepfather when she was five or six years old.
>
> R.M., her mother, and Bell resided in Waller County, and R.M considered Bell her father. Bell and R.M.'s mother had two daughters together who also lived with the family.
>
> On February 16, 2012, when she was a 15-year-old freshman in high school, R.M. reported to her school counselor that she was being touched inappropriately by Bell. The counselor testified at trial that R.M. began by writing a statement that she had been sexually abused, but as she became more comfortable, she made an oral disclosure of abuse. R.M. told her counselor that the abuse began when she was about ten years old. She described specific incidents of abuse that happened over the years and said that the latest incident occurred the night before. She told the counselor that this was the first time she was reporting the abuse. Based on the information, the counselor notified Child Protective Services (hereinafter "CPS") of R.M.'s outcry of sexual abuse.

---

[1] *See* Petition at 2.  Citations following "Doc. No. ---" reflect the Clerk's pagination as stamped by the CM/ECF system; if specified, citations to state court records reflect the pagination according to the Bates stamp on the bottom of the page of those records.

[2] Petition at 2.

The outcry triggered a criminal investigation. Lieutenant H. Sanders was assigned to the case and testified at trial. She was employed by the Waller County Sheriff's Office as a peace officer who specialized in sexual assault investigations. After receiving notice that R.M. had made an outcry, Lt. Sanders scheduled a forensic interview with R.M. that took place the next day. Lt. Sanders monitored R.M.'s forensic interview via closed circuit television but did not participate in the interview process. R.M. also had a sexual assault examination.

On the same day that she received the outcry notice, Lt. Sanders contacted R.M.'s mother, Laura Bell, by phone to get consent to retrieve evidence from R.M.'s bedroom. Initially, Laura Bell was cooperative and agreed to allow Lt. Sanders to retrieve items from the home for an investigation. Lt. Sanders retrieved several items. About a week later, Laura realized that R.M. was having explicit online communications with a 57-year-old man later identified as Patrick Mason. Laura phoned Lt. Sanders to report the discovery, and Lt. Sanders scheduled a second interview with R.M.

During the interview, R.M. admitted that she lied during the forensic interview when she did not disclose that Mason was the first person she told of her abuse. Instead, she said her school counselor was the first person because she knew her online communication with Mason was inappropriate and she did not want to get in trouble. R.M. also disclosed that it was Mason who encouraged her to tell someone that she was being sexually abused.

Based on information in the interview, Lt. Sanders obtained a search warrant on February 21, 2012, seeking information that would corroborate R.M.'s disclosure of her online communications and outcry to Mason. She obtained R.M.'s cell phone and computers, and analysts retrieved communications between R.M. and Mason. Lt. Sanders read the communication and noted that R.M. told Mason about her abuse on February 15, 2012, the day before she reported it to the school. He encouraged her to disclose the abuse, just as R.M. had said during her interview with Lt. Sanders. Lt. Sanders also reviewed photographs recovered from R.M.'s camera and home computer. R.M told Lt. Sanders she sent pictures to Mason, described the locations where the photographs were taken, and described the clothing she was wearing. Lt. Sanders identified the pictures in the materials recovered. She noted that they were not sexually explicit or suggestive and were exactly as R.M. described in the interview. Lt. Sanders also confirmed Mason's identity and contacted him in Michigan. He corroborated R.M.'s disclosures.

By two weeks into the investigation, R.M.'s mother no longer supported her and believed she fabricated the story of abuse. After the outcry, R.M. never lived at home again. She and her two younger half-sisters first went to stay with their maternal grandmother. R.M.'s grandmother also did not believe her. R.M. stayed briefly with an aunt before going back to her grandmother's, and eventually she lived at the Methodist Children's Home for four years.

R.M. testified at a jury trial five years later, when she was 20 years old. She explained that the abuse began when she was 10 or 11 years old and the earliest she can remember was an incident in the laundry room. She explained that she was helping Bell do laundry. Bell told R.M. to sit on a deep freezer and instructed her to pull aside her shorts. Bell approached with a "long metal-like object" that she later learned was a vibrator and touched it both inside and outside her vagina. He asked her how it felt. R.M. did not recall her response, only wishing that the event would end. She did as she was told because she feared a spanking, and she did not tell her mother because she did not comprehend the nature of the touching at the time.

She testified to a second incident of abuse in her bedroom when she was in the seventh grade. She recounted wanting something a child would want, such as food, a book, a toy, or money, and asking Bell for it. Bell told her to remove her clothing and sit on her bed. He then conducted an "anatomy lesson," explaining various parts of her body as he touched them, including touching her breasts and penetrating her vagina with his finger. When he was finished, Bell gave R.M. the item she asked for. She did not disclose the abuse for fear of not being believed and "losing everything."

She testified to a third incident in a field in summer of 2011 at 14 years old. After running errands, R.M. asked Bell to buy her lunch and books. He agreed if she would "do something" for him. Once she agreed, he purchased books and fast food. He drove R.M. to a field near their home, parked his truck, and touched her genitals, penetrating her vagina with his fingers. He also placed his mouth on her breasts. She did not disclose this incident because she was scared. R.M. verified the location of the field on a map during her testimony.

R.M. recounted additional incidents of sexual abuse between ages 12 and 14. These incidents involved Bell touching her breasts and genitals with his fingers and mouth and penetrating her vagina with his mouth and tongue. They occurred in her bedroom or in Bell's pickup truck on the backroads of Waller County. She described that the abuse occurred monthly in exchange for something she had asked for. She explained that she did not tell anyone

because she feared for her safety. On one occasion, she threatened to tell someone, and Bell responded that she "might end up dead" and nobody would blame him.

The final incident of sexual abuse occurred on February 15, 2012, the night before she reported to her school counselor. She asked for money for a book fair, and Bell agreed to give it to her if she did something for him. Her mother and siblings were asleep in their rooms. Bell instructed her to shower and shave her genital area. She caught him watching her shower, and he left the bathroom when he realized she had noticed. After the shower, she went to her bedroom. Bell placed his mouth on R.M.'s genitals and told her that he would give her extra money for two extra minutes of access. He set a timer for the additional minutes. He gave her $40 for the book fair, and she purchased books and pens.

R.M. testified that she had to ask permission to use the internet in the home and accessing the internet required a password key provided by Bell. She testified that he used internet access to force her to submit to additional acts of sexual abuse. She explained that she first accessed online chat rooms at school, but then she accessed them from her computer in her bedroom. She began regularly communicating with Patrick Mason. Initially, she told him that she was 23 years old and believed him to be in his 50s. Eventually, she disclosed her real age, and they continued to communicate online, often in a sexually explicit manner. Mason was adamant that they would never meet as long as she was under 18, and she never believed that they would have a relationship beyond online chatting. They exchanged photographs, but the photographs were not sexually explicit.

R.M. testified that she contacted Mason over the internet after Bell left her room on the night of February 15, 2012. She told him she was being sexually abused, and he encouraged her to tell a counselor. This prompted her to tell the counselor at school the next day.

She continued to have explicit conversations by text and internet with Mason after she reported the abuse. One incident occurred while she was living with her grandmother. Her mother found out and punished her with respect to phone and computer access. The same day, she requested to move to her aunt's house because her grandmother did not believe her about the abuse. Her mother also did not believe her. Eventually she moved into the Methodist Children's Home.

In addition to testimony from the school counselor and Lt. Sanders, the State called Fiona Remko, a licensed clinical social worker who conducted a forensic interview with R.M. She explained the forensic interview process and explained the dynamics of child abuse, such as grooming behaviors a perpetrator uses with a child victim to set the stage for sexual abuse. She also explained that in her experience, when a child discloses abuse, the entire family often blames the child, directing all their anger at the child and cutting the child out of their lives. Finally, she explained that children who suffer sexual abuse may engage in inappropriate or promiscuous behaviors.

Rachel Bryant, the nurse who performed the sexual assault examination on R.M., testified about the process of the examination, the information that R.M. relayed to her about abuse during the examination, and her findings. She explained that by the time she conducted the exam, R.M. had washed, urinated, ate and drank, and changed clothes, decreasing any possible DNA sample. She explained that the fact that R.M. did not have genital injuries was still consistent with having been sexually assaulted, including that in ten years of conducting between 1,500 and 2,000 exams, it was rare to see an injury.

Bell and his wife testified. Bell denied all allegations of sexual abuse. He described R.M. as having problems with discipline from the time he came into her life and acknowledged that he was the disciplinarian. She understood that if she disobeyed him, she would get in trouble. He referred to specific instances of spanking because she spoke disrespectfully to her mother. He admitted that he could restrict her internet access, and he was angry when he found out that R.M. was communicating with Mason because she had claimed that she was doing homework on the computer. He believed that Mason and R.M. conspired to falsely accuse him of sexual assault so that they could be together, but he conceded that to do so they would have to formulate and discuss a plan. He agreed that none of the online communication between them discussed a plan to do so.

Bell acknowledged that many details of R.M.'s disclosure were accurate. For example, R.M. and Bell stayed up later than the other people in the house. Her bedroom was on the opposite side of the house from her parents' bedroom. He and R.M. frequently went places together alone in his truck, such as for fast food and to buy books. They were alone in a field together more than once, and he woke R.M. up each morning.

Bell also acknowledged that he spoke with a law enforcement officer on the day after R.M. disclosed abuse to her counselor. When questioned at trial, he agreed that when the officer asked if he touched R.M.'s breast when she was ten years old, he did not deny it but instead asked if she even had breasts at that age. When the officer confronted him with R.M.'s accusation that he penetrated R.M.'s vagina with his finger, he did not deny it but instead asked if it would "leave DNA." When the officer presented Bell with R.M.'s disclosure of specific details of the abuse, he stated, "In other words, it doesn't look good for me." And at the end of his interview, Bell reviewed R.M.'s disclosure and responded, "No matter what, this is a black eye for both of us."

Bell also acknowledged that he volunteered specific information to the officer without being questioned about it. Before the officer disclosed that R.M. had alleged he went in her bathroom while she was showering, Bell told the officer that he had been in the bathroom with R.M. while she was showering, but then he explained it was to kill a bug. He also volunteered that he had given R.M. $40 for the book fair before her outcry, even though the officer had not mentioned R.M.'s allegation that the $40 was payment for sexual contact.

Laura Bell testified that she did not believe R.M. She testified that she thought the Methodist Children's Home would be a safe environment for R.M. to get counseling for "somebody who is, you know, able to lie about something like this." She acknowledged that in five years, R.M. never recanted or changed the story told her counselor, the investigating officer, the nurse who examined her, the State's attorney, CPS, and the jury.

The jury found Bell guilty. Following a sentencing hearing, the court sentenced him to 55 years' imprisonment.

*Bell*, 2019 WL 1560855, at *1–4.

Bell filed a state application for habeas corpus on September 3, 2020. He subsequently requested an evidentiary hearing based on his claims of prosecutorial misconduct (based on an allegedly misleading DNA lab report and false testimony) and ineffective assistance of counsel (for failing to investigate the DNA evidence with an expert and failing to impeach R.M.). The habeas court conducted a hearing on Bell's claims and

issued extensive findings of fact and conclusions of law, recommending that his habeas application be denied. The Texas Court of Criminal Appeals denied Bell's application without written order on the findings of the trial court after a hearing and on an independent review of the record. *See Ex parte Bell*, WR-92,405-01 (Tex. Crim. App. June 16, 2021), Doc. No. 8-20 (Action Taken Sheet). This federal petition timely followed.

## II.    CLAIMS

Bell asserts the following claims:

1.    The state used a false and misleading lab report and false testimony.

2.    Bell was denied effective assistance of counsel because his trial counsel, Mr. Calvin Garvie, did not follow up with his DNA expert to review the DNA evidence during the trial phase of the proceedings and failed to impeach the complainant with prior inconsistent statements.

3.    The cumulative effect of the false lab report/testimony and ineffective assistance of counsel denied the petitioner a fair trial.

*See* Petition at 6-7.

## III.    STANDARD OF REVIEW

To be entitled to summary judgment, the pleadings and summary judgment evidence must show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the burden of initially raising the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial. *Duckett v. City of Cedar Park, Tex.,*

950 F.2d 272, 276 (5th Cir. 1992). Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Seque Software, Inc.,* 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner,* 18 F.3d 1285, 1295 (5th Cir. 1994)). The Court may grant summary judgment on any ground supported by the record, even if the ground is not raised by the movant. *United States v. Houston Pipeline Co.,* 37 F.3d 22 4, 227 (5th Cir. 1994).

While Rule 56 of the Federal Rules regarding summary judgment applies generally "with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir. 2000), it applies only to the extent that it does not conflict with the habeas rules. *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002), *abrogated on other grounds by Tennard v. Dretke,* 542 U.S. 274 (2004).

The writ of habeas corpus provides an important, but limited, examination of an inmate's conviction and sentence. *See Harrington v. Richter,* 562 U.S. 86, 103 (2011) (noting that "state courts are the principal forum for asserting constitutional challenges to state convictions"). The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), codified as amended at 28 U.S.C. § 2254(d), "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt"; it also codifies the traditional principles of finality, comity, and federalism that underlie the limited scope of federal habeas review. *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quotations omitted).

AEDPA "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Harrington,* 562 U.S. at 98. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99. For AEDPA to apply, a state court need not state its reasons for its denial, nor must it issue findings, nor need it specifically state that the adjudication was "on the merits." *Id.* at 98-99.

To the extent that the petitioner exhausted his claims, they were adjudicated on the merits by state courts. This Court, therefore, can only grant relief if "the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins,* 560 U.S. 370, 378 (2010) (quoting 28 U.S.C. § 2254(d) (1)). The focus of this well-developed standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007). Where a claim has been adjudicated on the merits by the state courts, relief is available under § 2254(d) *only* in those situations "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. *Harrington,* 562 U.S. at 102.

Whether a federal habeas court would have, or could have, reached a conclusion contrary to that reached by the state court on an issue is not determinative under § 2254(d).

*Id.* ("even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable."). Thus, AEDPA serves as a "guard against extreme malfunctions in the state criminal justice systems," not as a vehicle for error correction. *Id.* (citation omitted); *see also Wilson v. Cain,* 641 F.3d 96, 100 (5th Cir. 2011). "If this standard is difficult to meet, that is because it was meant to be." *Harrington,* 562 U.S. at 102.

"Review under § 2254(d)(1) focuses on what a state court knew and did." *Cullen v. Pinholster,* 563 U.S. 170, 182 (2011). Reasoning that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court," *Pinholster* explicitly held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 185. Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.*

## IV.   DISCUSSION

### A.   Prosecutorial Misconduct (Ground One)

Bell alleges that the prosecutor committed misconduct and denied him a fair trial because she presented (1) a false and misleading DNA lab report; (2) false testimony concerning whether an assailant would have to ejaculate to leave DNA; and (3) false testimony that Bell was the only male with whom R.M. had been sexually intimate.

A public official's concealment of exculpatory evidence violates a criminal defendant's constitutional rights. *See Brown v. Miller*, 519 F.3d 231, 238 (5th Cir. 2008)

(civil rights case under 42 U.S.C. § 1983 citing *Burge v. Parish of St. Tammany*, 187 F.3d 452, 480 n.11 (5th Cir. 1999)).   In the context of a federal habeas proceeding under 28 U.S.C. § 2254, the court must determine whether the alleged prosecutorial misconduct "so infected the . . . trial with unfairness as to make the result[] a denial of due process." *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000).   "A trial is fundamentally unfair if 'there is a reasonable probability that the verdict might have been different had the trial been properly conducted.'"  *Id.* (quoting *Foy v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992)).

"The State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction[.]"  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).   The prosecution denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected.  *Giglio v. United States*, 405 U.S. 150 (1972); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir.), *cert. denied*, 519 U.S. 995 (1996).   To demonstrate a constitutional violation based on the State's use of perjured testimony or a failure to correct false testimony, a habeas petitioner must show that "(1) the testimony was actually false, (2) the state knew it was false, and (3) the testimony was material."  *Faulder*, 82 F.3d at 519.   "To warrant a new trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'"  *Trottie v. Stephens*, 720 F.3d 231, 253 (5th Cir. 2013) (quoting *United States v. Jimenez,* 509 F.3d 682, 691–92 (5th Cir. 2007); *United States v. Wyly,* 193 F.3d 289, 299 (5th Cir.1999)).   Under AEDPA, the "prosecutorial-misconduct

analysis is subject not only to the 'high bar' discussed above, but also to the deference that

we afford to the state habeas court's decision." *Id.*

### 1.   DNA Lab Report

After R.M.'s outcry, Sexual Assault Nurse Examiner (SANE) Rachel Bryant

conducted a SANE examination, taking labial and vaginal swabs of R.M., among other

evidentiary swabs.   As part of the pre-trial investigation, investigators also took a cheek

swab sample from Bell for comparison.   Jennifer Pollock, a Texas Department of Public

Safety (DPS) laboratory analyst, tested the samples.   The DPS "YSTR Laboratory Report"[3]

indicated that "no Y-STR profile was obtained" for all but one of the evidentiary samples

from R.M., but for the M2 sample (vaginal swab), the report indicated that "no interpretable

Y-STR profile was obtained."[4]   The Y-STR report and other DPS laboratory reports

submitted as evidence showed that Bell did not contribute to any of the DNA found in

R.M.'s samples.[5]

Before trial, Mr. Garvie, Bell's trial counsel, requested and received authorization

to hire Dr. Elizabeth Johnson as a DNA expert, reached out to Johnson initially about the

case, and sent Johnson the DNA discovery.   However, Garvie did not obtain a report from

Johnson.   Because the parties agreed that the evidentiary samples taken from R.M. did not

---

[3] Y-STR stands for "short tandem repeat" polymerase chain reaction (PCR) DNA analysis of
certain loci on the Y (male) chromosome. *See* Doc. No. 8-18 at 45.  According to the report, the
test run by DPS examined the following 16 loci: DYS456, DYS3891, DYS390, DYS38911,
DYS458, DYS19, DYS385a/b, DYS393, DYS391, DYS439, DYS635, DYS392, YGATA H4,
DYS437, DYS438, and DYS448. *Id.*
[4] Doc. No. 8-18 at 45 (State's Exhibit 42).
[5] *See id.* at 42-46.

contain any DNA from Bell and the State would not be presenting testimony from the DPS analyst who performed the testing, Garvie determined that he did not need Dr. Johnson to testify.[6]  Instead, the parties entered into a Stipulation of Evidence that stated, among other things, that the DNA profile of John Franklin Bell, Jr. was not detected on any of the items submitted and tested by DPS.[7]

Bell's first post-conviction DNA forensic expert, Dr. Frank Powell, was initially asked to provide his opinion on whether Lt. Heather Sanders's testimony—that a male would have to ejaculate to leave detectable DNA in a vaginal swab sample—was false.[8] After reviewing the record and reading the DNA Lab Report, Powell asked to review the DNA discovery because he noticed that while most of the evidentiary swab samples reflected that "no Y-STR profile was obtained," the M2 vaginal swab sample results stated that "no *interpretable* Y-STR profile was obtained."[9]   According to Powell, the electropherogram results for the M2 sample showed that there was a peak that appeared to be above the reporting threshold at the 15 allele on the DYS456 locus.[10]  He also noted that the electropherogram results for Bell's comparison sample indicated an initial, "off-scale"

---

[6] Doc. No. 8-22 (State Habeas Corpus Hearing) at 195:19-25, 218:18 – 219:3.

[7] *Id.* at 195:19-25; *see also* Doc. No. 8-23 at 5-7 (State's Exhibit A).

[8] Doc. No. 8-23 at 144 (Affidavit of Dr. Frank Powell).

[9] *Id.*; Doc. No. 8-18 at 45 (emphasis added).

[10] *See* Doc. No. 8-23 at 145, 185 (electropherogram); *see also* Doc. No. 8-23 at 190 (Affidavit of Dr. Angie Ambers) (noting that the DPS Standard Operating Procedures' analytical threshold for Y-STR allele data is 100 RFUs (relative fluorescence units) and noting that the electropherogram did not provide specific RFU data but the peak for the 15 allele at the DYS456 locus appears to be above threshold because it registered in the DPS software).

peak at the 16 allele on the DYS456 locus, which Pollock, who performed the testing, had noted as "INC" for "inconclusive" rather than re-running the sample.[11]

Bell contends that Pollock's lab report was false and misleading and denied him due process and a fair trial.  He argues that Pollock's characterization of the DNA results in the vaginal swab sample as uninterpretable for comparison purposes was false because there was a 15 allele on the Y-STR DYS456 locus, whereas Bell contends he has a 16 allele for the Y-STR DYS456 locus.  Bell claims that the DNA results show that there was another male contributor for the 15 allele.  He also contends that, had the jury heard about the presence of other male DNA, his trial counsel could have impeached R.M.'s testimony that she had not been sexually active with anyone but Bell.  Bell further argues that Pollock should have re-run his DNA comparison sample rather than considering it "inconclusive," and that the single peak on the evidentiary sample from R.M.—which did not match his DNA Y-STR profile—is enough to exclude him as a contributor.[12]

The Honorable Albert M. McCaig, Jr., presided over both the trial and the state habeas corpus proceeding and issued extensive Findings of Fact and Conclusions of Law after a lengthy hearing on Bell's habeas claims.  He heard the testimony of all of the witnesses at trial, including that of R.M. and Bell; witnessed first-hand the assistance that Garvie provided to Bell at trial; and heard the testimony of the DNA forensic experts, DPS forensic analyst Pollock, and trial counsel at the habeas corpus hearing.

---

[11] *Id.* at 145 (Affidavit of Dr. Frank Powell).
[12] As used here, "evidentiary samples" refer to the swabs taken from R.M. and "comparison sample" refers to the swab taken from Bell.

Regarding Bell's DNA lab report claim, the state habeas court made the following

relevant factual findings:

> 11. Under then current DPS lab protocols, Jennifer Pollock had no scientific
> basis for completing an on-scale profile regarding the Bell DNA and the
> unknown DNA in that there was nothing with which to compare the unknown
> DNA. There was no identified third-party or DNA from an unknown third-
> party male on which to make a comparison.
>
> . . . .
>
> 15. All of the evidence and all the testimony at trial and at the writ hearing
> agrees that John Franklin Bell, Jr., did not contribute any DNA found on any
> of the evidentiary items or on R.M., and is uncontroverted.
>
> . . . .
>
> 19. The Lab Report did not say that there was *no male DNA* found on the
> vaginal swab; it clearly stated that the DNA was not *interpretable* under the
> DPS lab protocols in place at the time.
>
> 20. The Court finds Jennifer Pollock to be a credible and reliable witness and
> her affidavits to be credible and supported by the record from the trial and
> habeas corpus proceedings.
>
> 21. The Court finds Jennifer Pollock to be a qualified DNA analyst based on
> her educational background, training, qualifications, and 13 years of analysis
> experience. (SX C, SXD).
>
> 22. The Court finds Jennifer Pollock to be competent and technically
> proficient in the field of DNA analysis and reporting. (SX C, AX 20) 23. The
> Court finds that Jennifer Pollock's employment evaluations reflect that she
> meets or exceeds employment expectations and is competent, skilled and
> effective in the performance of her duties as a forensic scientist since the
> beginning of her employment with the Texas Department of Public Safety in
> 2007. (AX 20)
>
> 24. The Court finds that Pollock evaluated all the samples from R.M.'s
> vaginal swabs, prior to reviewing any DNA sample from a known

contributor; and, this practice was in keeping with SWGDAM[13] guidelines and mitigated any cognitive bias. (SX C)

25. Texas DPS Y-STR interpretation guidelines define an inconclusive result as "insufficient Y-STR data or data too complex for meaningful interpretation." (SX F (5.4C Possible Conclusions))

26. Pollock followed both the DPS Y-STR Interpretation Guidelines (SX F) and the DPS Standard Operating Procedures/Subject: Report Writing Guidelines (SX G), m preparing and writing the Lap Report in question.

27. Pollock's work notes reflect that the electropherogram on the DNA Extract from the vaginal swab of R. M. had one 15 allele at the DYS456 locus. (AX 13)

28. The Court finds that it cannot be determined how or when the biological material that contained this one 15 allele was deposited on the vaginal swab sample (AX 9); and, it cannot be determined if the one 15 allele was the result of contamination of the sample or if it is scientifically accurate or reliable data. Although the called allele is above threshold, it is still possible that it was an anomaly, the result of random allele drop-in, or other effects and artifacts from the PCR process. (SX C)

29. An electropherogram of the DNA extract taken from the applicant's sample suggested he had a 16 allele at the DYS456 locus. The RFU level for the 16 allele call was likely the result of spectral pull-up and therefore exceeded the maximum analytical threshold approved by the laboratory. The Standard Operating Procedures for the laboratory state that "if data exceeds the maximum analytical threshold at any locus, the off-scale locus must be called inconclusive or the sample reanalyzed." (AX 9, SX F)

30. Post-trial DNA testing confirmed that the applicant has a 16 allele at the DYS456 locus. If the one 15 allele detected at the same location on R. M.'s vaginal swab sample is an accurate finding, the applicant is excluded as a contributor.

31. The Court finds by a preponderance of the credible evidence, that, based on DPS lab protocols in place at the time of the Lab Report, and remaining in effect through the writ hearing in December 2020, the Department of

---

[13] SWGDAM stands for "Scientific Working Group on DNA Analysis Methods." *See* SWGDAM website, *available at* www.swgdam.org, last visited Sept. 7, 2022.

Public Safety report in question, Applicant's Exhibit 2, at the writ hearing, is not false and misleading.[14]

Bell contends that the state habeas court's factual findings that the lab report was not false and misleading is "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  In determining whether a state court's determination of the facts was unreasonable under AEDPA, the Supreme Court has explained that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  Further, it noted that "even if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." *Id.* (internal quotation marks and alteration omitted); *see also Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (explaining that "under § 2254(d)(2), it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question'" (citation omitted)).

At the state habeas hearing, Pollock testified that she determined that the information present for R.M.'s vaginal swab sample was uninterpretable and inconclusive for comparison purposes.[15]  Pollock explained that, once she obtained inconclusive results from the evidentiary sample (the sample from R.M.'s vaginal swab), there was no need for

---

[14] Doc. No. 8-26 at 69-71, State Habeas Corpus Record (SHCR) at 676-78 (Findings of Fact on Material Fact Issue No. 1).

[15] Doc. No. 8-26 at 68, SHCR at 675; *see also* Doc. No. 8-22 (State Habeas Corpus Hearing) at 34:24, 42:15-20, 73:4-6.

further comparison of Bell's sample because the evidentiary sample had too little data about which to make a conclusive result.[16] She noted that, in her professional opinion and expertise in testing DNA samples, it was not a good sample for meaningful interpretation.[17] Pollock explained: "Since I deemed the evidence inconclusive, no further comparisons or anything else would be done with that evidence."[18] She testified that, per protocols and Standard Operating Procedures at the DPS at the time, the first step for the technician is to determine a conclusion about an evidentiary sample (in this case, the vaginal swab sample), and once a technician decides that the profile is inconclusive, everything "stops" and the technician is not supposed to make a comparison off that sample.[19] Pollock also testified that Bell's comparison sample had an inconclusive result at the DSY456 locus, explaining:

> [I]t's off-scale data which is very common for us to encounter. And by the indications on the electropherogram, it's self-explanatory for a DNA analyst. So, again, it was marked inconclusive because nothing was being done with that known sample for any comparison purposes.[20]

When challenged as to why she did not re-run Bell's comparison sample, she explained that it would be a waste of consumable resources at the lab for her to use more reagents on a test that they were not going to use for comparison purposes because the evidentiary sample did not yield interpretable data.[21]

---

[16] Doc. No. 8-22 (State Habeas Corpus Hearing) at 42:15-20, 73:4-6.
[17] *Id.* at 34:3-6, 61:15-20.
[18] *Id.* at 36:17-19.
[19] *Id.* at 41:23 – 42:6.
[20] *Id.* at 39:25 – 40:6.
[21] *Id.* at 41:18-20.

The state habeas court heard Pollock's testimony and the testimony of two of Bell's experts and found that Pollock was a credible and reliable witness.[22]  "A credibility determination by the state habeas court is also afforded deference." *Coleman v. Quarterman*, 456 F.3d 537, 541 (5th Cir. 2006) (citation omitted).  Further, the "presumption [of correctness] is especially strong when the state habeas court and the trial court are one in the same," as in this case. *Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014) (quotations and citations omitted); *Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 2014) ("The presumption is particularly strong where, as here, the habeas court was the same court that presided over the trial.").

Pollock's testimony is evidence in the habeas record that she determined that the evidentiary sample was not interpretable for comparison purposes, and the electropherogram printout of the M2 vaginal swab sample at issue reflects that, out of the 16 loci tested,[23] only one peak appeared at one locus.[24]  Dr. Robert Benjamin, one of Bell's DNA experts, noted that "[a]lthough based upon the laboratory's interpretational guidelines this limited information is not used for comparison purposes (inclusion/exclusion of individuals), it is still quite true that the male genetic material recovered from the vaginal swab could not have come from John Franklin Bell, Jr."[25]

---

[22] Doc. No. 8-26 at 70, SHCR at 677 ¶ 20 (Findings of Fact on Material Fact Issue Number 1).
[23] As noted *supra* note 3, the 16 loci that were tested in the Y-STR DNA test are: DYS456, DYS3891, DYS390, DYS38911, DYS458, DYS19, DYS385a/b, DYS393, DYS391, DYS439, DYS635, DYS392, YGATA H4, DYS437, DYS438, and DYS448. *See* Doc. No. 8-18 at 45. Only the DYS456 locus yielded any measurable results. *See* Doc. No. 8-23 at 185.
[24] Doc. No. 8-23 at 185 (Y-STR electropherogram results for the M2 vaginal swab sample).
[25] Doc. No. 8-23 at 220 (Affidavit of Dr. Robert Benjamin).

Given that the sample yielded such "limited data" even according to Bell's expert, along with the testimony of Pollock and the DNA electropherogram results, the record contains evidence to support the state habeas court's factual finding that the sample yielded too little usable data to be reliable for comparison purposes, and, therefore, the lab report was not false or misleading based on the DPS lab protocols in place at the time. Bell does not meet his burden to show, by clear and convincing evidence, that the state court's finding regarding the YSTR Laboratory Report was an unreasonable determination of the facts based on the evidence in the state court record. Accordingly, the state court's factual finding that the DNA report was not false or misleading is entitled to the presumption of correctness under AEDPA.

### 2.    Lieutenant Sanders's Testimony

Bell also alleges that the prosecutor elicited false testimony from Sanders when Sanders testified that Bell would have had to ejaculate in order to leave his DNA in R.M.'s vagina. It is uncontroverted that this statement is not scientifically accurate. To obtain relief based on the state's use of false testimony or a failure to correct false testimony, a habeas petitioner seeking federal relief from a state court judgment must show that "(1) the testimony was actually false, (2) the state knew it was false and (3) the testimony was material." *Faulder*, 82 F.3d at 519. A habeas petitioner must also show that the prosecutorial misconduct was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." *Trottie*, 720 F.3d at 253.

The state habeas court noted at the outset that Bell "withdrew his claim of prosecutorial misconduct that the State knowingly used false testimony to secure a conviction; therefore, leaving the claim that the State's attorney unknowingly used false testimony to secure a conviction."[26]   The state habeas court found that, in view of the Stipulation of Evidence and all representations by the State specifically negating the presence of Bell's DNA on any of the evidence, "an inaccurate statement about how DNA may be deposited in the limited circumstances of the facts of this case do not prejudice [Bell]."[27]

Further, the state habeas court found that "trial court judge gave a limiting instruction with respect to [Sanders's] testimony, instructing the jury that LT Sanders was testifying for the 'limited purpose of testifying as an investigator of these types of offenses'" and the "jury was instructed not to consider LT Sanders as an expert in DNA."[28] In addition, the state court found that another witness at trial, Rachel Bryant, testified that she "would not be surprised" if DNA has been found in cases where the victim was penetrated by a finger.[29]   The state habeas court further found that Sanders's inaccurate statement that a male would have to ejaculate to be able to leave his DNA, when taken in

---

[26] Doc. No. 8-26 at 66, SHCR at 673.  The state habeas record confirms that Bell's post-conviction counsel stated on the record that "I'm not suggesting that she knew – that Ms. Magness knew that there was false testimony."  Doc. No. 8-22 (State Habeas Corpus Hearing) at 223:19-20.  Post-conviction counsel also stated that "I'm not alleging that Ms. Magness intentionally put on false testimony" and "I said in the brief I wasn't alleging that."  *Id.* at 225:11-15.

[27] Doc. No. 8-26 at 72, SHCR at 679 ¶5 (Findings of Fact on Material Issue Number 2).

[28] *Id.* at 680 ¶ 13.

[29] *Id.* ¶ 16.

context of whether Bell ejaculated into R.M.'s vaginal canal, did not prejudice Bell at trial.[30]

Bell does not contend, in this federal proceeding, that the prosecutor knowingly presented false testimony to the jury. Instead, without citing to authority, he argues that a defendant "need not show that the prosecutor knew at the time that the testimony was false or misleading." Doc. No. 3 at 13. Contrary to Bell's unsupported assertion, the Fifth Circuit has explained that "'[a]lthough some circuits recognize a due process violation when perjured testimony is provided by a government witness even *without* the government's knowledge, we are limited by the AEDPA to applying only established Supreme Court precedent,' which 'demands proof that the prosecution made knowing use of perjured testimony.'" *Pierre v. Vannoy*, 891 F.3d 224, 228 & n.3 (5th Cir. 2018) (quoting *Kinsel v. Cain*, 647 F.3d 265, 271–72 & n.26 (5th Cir. 2011); also citing other cases and *Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002) ("[D]ue process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured.")). Accordingly, Bell must show that the prosecutor knew that the testimony was false in order to show a constitutional violation for federal habeas relief. As the state habeas court found and the hearing transcript shows, Bell does not contend that the prosecution knew that Sanders's testimony was false. Therefore, he cannot show entitlement to habeas relief on his prosecutorial misconduct claims as a matter of law.

---

[30] *Id.* ¶ 17.

Even if Bell did not need to show that the prosecutor knew that the testimony was false, the state habeas court also found that the testimony did not prejudice Bell because the trial court gave a limiting instruction that Sanders was not a DNA expert, and another witness stated that she would not be surprised if DNA would be recovered if an assailant spit on his fingers. The state habeas court's conclusion that such testimony did not cause prejudice is not contrary to, or an unreasonable application of, Supreme Court law, nor is it an unreasonable determination of the facts based on the record as noted above. Therefore, Bell does not show that he is entitled to habeas relief based on Sanders's testimony.

### 3. R.M.'s statement that she was not sexually active with anyone else

Bell claims that the prosecution elicited false testimony from R.M. about not being sexually active with anyone else because there was a 15 allele at the DYS456 locus that did not belong to Bell in R.M.'s Y-STR vaginal swab sample. He contends that the 15 allele was a true allele from another male and, therefore, R.M. lied.

As explained above, even if this testimony was false, Bell does not contend that the prosecution knowingly presented false testimony to the jury. Accordingly, Bell cannot prevail on this claim as a matter of law. *See Pierre, supra.*

In addition, the state habeas court, taking into consideration R.M.'s entire testimony, the investigation, and the fact that she had been caught in lies of omission and commission to her parents, her grandparents, her teachers, the forensic interviewer, the SANE nurse, and Lieutenant Sanders, made the following findings regarding R.M.'s testimony:

23. The Court finds, by a preponderance of the evidence, that the testimony by R.M. at trial is clear and that she stated that she had not been sexually active prior to the outcry. (3 RR 165)

24. R.M.'s whereabouts in the days before her outcry were established through the testimony of R.M., the applicant, and R.M.'s mother, Laura Bell.

25. In the days preceding her outcry of abuse, the trial testimony firmly established she was with the applicant, her mother, or in school. She did not have the opportunity outside of those occasions to have sexual contact with anyone other than the applicant.

26. When questions about her experience as an investigator with 17 years working in child sex cases, LT Sanders stated, "Well, children who have been sexually abused as young children typically go for different outlets out there, as in older relationships with people that they probably shouldn't be in relationships with. They go out there and sexting. Some get involved in prostitution. There are no bounds to the type of behavior that come from children who are sexually abused and what they do. And it's all an outcry." (3 R.R. Page 237)

27. In questioning by the State, Fiona Remko, the forensic examiner, during the trial stated the following about whether children who have been sexually abused engage in inappropriate behavior: "And so kids oftentimes seek that out, especially if their emotional needs aren't being met somewhere else, so they can become promiscuous because that's how they've been taught to show love and affection obviously in an unhealthy way" ( 4 R.R. page 21).

28. During the investigation and trial R.M. had already been caught in several lies and the jury, as judges of the credibility of the witness during her testimony five years after the disclosure of the acts, chose to disregard those lies in arriving at its verdict of guilty.

29. The Court finds by a preponderance of the credible evidence that whether R.M. was sexually active with another unknown male, or not, does not negate her testimony and the investigation regarding the acts of John Frank Bell, Jr. At most, the issue of her sexual activity could have possibly opened the door for her impeachment within the bounds of Texas Rules of Evidence 404 and Article VI. Witnesses.

30. The Court finds by a preponderance of the credible evidence that the testimony of RM that she was not sexually active with anyone other than Bell was not false.[31]

The state court also concluded that "there is no reasonable likelihood that her testimony would have affected the judgment of the jury," and Bell "failed to prove that the outcome of the trial would have been different without the statement by R.M. regarding her sexual activity prior to the outcry."[32]

The record shows that defense counsel presented examples to the jury of R.M. lying or being caught in a lie around the time of the incidents in question. The jury heard about R.M.'s concealment of Patrick Mason, her deceptive use of the internet for non-school purposes, and her troubles at school with her grades, among other things. Nonetheless, the jury also heard R.M.'s detailed testimony about what Bell had done to her over the course of several years, and they heard Bell's testimony in his own defense. The state habeas court noted that although R.M. had already been caught in several lies, "the jury, as judges of the credibility of the witness during her testimony five years after the disclosure of the acts, chose to disregard those lies in arriving at its verdict of guilty."[33] The state habeas court found, by a preponderance of the evidence, "that whether R.M. was sexually active with another unknown male, or not, does not negate her testimony and the investigation regarding the acts of John Franklin Bell, Jr." and at most could have been used for impeachment.[34]

---

[31] Doc. No. 8-26, SHCR at 681-82 ¶¶ 22-30 (Findings of Fact on Material Fact Issue Number 2).

[32] *Id.* at 682 ¶¶ 6-7 (Conclusions of Law on Material Fact Issue Number 2).

[33] *Id.* ¶ 28.

[34] *Id.* ¶ 29.

The state habeas court's conclusion that Bell did not show that the outcome of his trial would have been different without the statement by R.M. regarding her sexual activity prior to the outcry is not an unreasonable determination based on the facts in the record. On federal review, Bell does not meet the "high bar" to show that any prosecutorial misconduct "permeate[d] the entire atmosphere of the trial," nor does he overcome the deference a federal court affords to the state court's factual determination under AEDPA. *See Trottie*, 720 F.3d at 253. Further, as explained above, he does not show that the state court's conclusion that there was no basis for a prosecutorial misconduct claim was contrary to, or an unreasonable application of, Supreme Court precedent. Therefore, Respondent is entitled to summary judgment regarding Ground One.

## B.     Ineffective Assistance of Counsel (Ground Two)

The Constitution guarantees a fair trial for criminal defendants through the Due Process Clause, but the Sixth Amendment, which conveys the right to have the effective assistance of counsel, largely defines the basic elements of a fair trial. *See* U.S. CONST. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 685 (1984); *see also McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (observing that "the right to counsel is the right to the effective assistance of counsel"). Claims for ineffective assistance of counsel are analyzed under the following two-prong standard:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. Thus, to prevail under the *Strickland* standard, a defendant must demonstrate both constitutionally deficient performance by counsel and actual prejudice as a result of the alleged deficiency. *See Williams v. Taylor*, 529 U.S. 390, 390-91 (2000).

The first prong of the governing standard is only satisfied where the defendant shows that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687. Scrutiny of counsel's performance must be "highly deferential," and a reviewing court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *See United States v. Molina-Uribe*, 429 F.3d 514, 518 (5th Cir. 2005) (citing *Strickland*, 466 U.S. at 687-88), *cert. denied*, 547 U.S. 1041 (2006). In the Fifth Circuit, "federal habeas review of a state court's denial of an ineffective-assistance-of-counsel claim is 'doubly deferential' because we take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)." *Rhoades v. Davis*, 852 F.3d 422, 434 (5th Cir. 2017).

To prove prejudice, the second prong under *Strickland*, a defendant must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different."  466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

Bell claims that Garvie was ineffective because he did not follow up with his DNA expert who could have testified regarding the DNA discovery and the 15 allele that did not match Bell's DNA profile.   He contends that Garvie could have used the DNA electropherogram results to suggest the presence of another male's DNA in R.M.'s vaginal swab to attack her credibility regarding her testimony that she had not been sexually intimate with any other person, and that he could have pointed out inconsistencies in her statements about whether Bell used his finger or his tongue on the night before her outcry.

In its Findings of Fact on this issue, the state habeas court found Mr. Garvie to be an experienced criminal defense attorney.[35]  It found that Garvie received a copy of the DPS YSTR Laboratory Report and Pollock's work notes but, because he did not fully understand them, he filed a motion for the court to appoint Dr. Elizabeth Johnson as a defense DNA expert.[36]  The record reflects that the trial court granted Garvie's request for a DNA expert and authorized up to $3,000 for compensation with the possibility of additional compensation if needed.[37]  Garvie filed a motion for review and re-testing of the DNA evidence, but the trial court denied his request and ordered the state to provide the existing DNA discovery.[38]

---

[35] Doc. No. 8-26 at 76, SHCR at 683 ¶ 1 (Findings of Fact on Material Issue Number 4).
[36] *Id.* at 683-84 ¶¶ 2-3.
[37] *Id.* at 684 ¶ 4.
[38] *Id.* ¶ 5.

At the state habeas hearing, Garvie testified that he asked Dr. Elizabeth Johnson to review the DNA discovery and tell him if he needed her to testify.[39]  He further testified that he gave Johnson the DNA discovery and asked her to make sense of it for him.[40] According to Garvie, he had a conversation with Johnson where they talked about her testifying if the State called the DPS analyst to testify.[41]  Garvie testified that he and the State entered into the  Stipulation of Evidence because the DPS analyst was not going to testify and Garvie consequently concluded that he did not need Dr. Johnson to testify.[42] Garvie stated that he expected that Dr. Johnson would call him if she had found anything different.[43]

Garvie further testified that he had defensive theories based on: (1) the fact that no DNA tied Bell to the crime; (2) the texts indicating that Patrick Mason was controlling R.M. as a dominant and she was a submissive and, therefore, she made this up to be with Patrick Mason; and (3) the lack of evidence tying Bell to the offense.[44]  Garvie explained that he achieved #1 and #3 with the Stipulation that he considered to be more favorable to the defense than the actual DNA lab report.[45]  He also stated that, had he known and understood the issue with the 15 allele in the vaginal swab sample, he would have added this information "on the side" with all of the other impeaching information he presented to

---

[39] Doc. No. 8-22 (State Habeas Corpus Hearing) at 195:1-4.
[40] *Id.* at 189:15 – 190:3.
[41] *Id.* at 195:6-10.
[42] *Id.* at 195:19-25, 218:18 – 219:3.
[43] *Id.* at 196:8-10.
[44] *Id.* at 188:3-6, 214:23 – 215:20.
[45] *Id.* at 215:6-20.

the jury, but that his focus was on Patrick Mason and his involvement with R.M., including the pornographic pictures she sent to Mason and the control he seemed to exert over her.[46] He questioned whether challenging R.M. on being sexually active would have been an effective argument in view of the defensive strategy to present Patrick Mason as R.M.'s real sexual interest.[47]   He further testified that he established his defensive theories and pursued them as his trial strategy throughout the case.[48]

The state habeas court found Garvie to be diligent in moving for appointment of a DNA expert and that he was relying on Dr. Johnson's expertise to understand the DNA discovery for cross-examining the state's expert at trial.[49]   It further found that Garvie persuaded the state to stipulate that the applicant's DNA profile was not detected on any item submitted and tested by the DPS, and that the reports would be submitted without calling a sponsoring witness.[50]   The habeas court also found that the Stipulation of Evidence supported Garvie's trial strategy that the state could not produce any DNA evidence linking Bell to the crime or establishing his guilt.[51]   The state habeas court concluded that Garvie's decision not to call Dr. Johnson was a reasonable tactical decision and part of his sound trial strategy in light of the favorable Stipulation.[52]

---

[46] *Id.* at 216:2-13.
[47] *Id.* at 216:24 – 217:7.
[48] *Id.* at 217:3-7.
[49] Doc. No. 8-26 at 77, SHCR at 684 ¶ 9 (Findings of Fact on Material Issue Number 4).
[50] *Id.* at 685 ¶ 16.
[51] *Id.* ¶ 17.
[52] *Id.* ¶ 19.

The state habeas court noted that although the presence of the 15 allele could have opened the door for Garvie to impeach R.M., any attempt to impeach R.M. suggesting that she had sexual contact with another male was in conflict with trial counsel's defensive theory, namely, that all allegations of sexual contact were fabricated so R.M. could pursue a relationship with an out-of-state, online, adult suitor named Patrick Mason.[53]   The state habeas court further found that Garvie developed his defensive theory by presenting a cohesive statement of the case and noted that Garvie elicited evidence to support his trial strategy to impeach R.M. at trial as follows:

a. R.M. became upset when Bell grounded her on the night of February 15, 2012 (4 R.R. 174-78). Thus, R.M. was seeking revenge on Bell.

b. On February 20, R.M., while staying with her grandmother, tried to hide her phone from Laura Bell, who took it and discovered that R.M. had been chatting online with a 57-yearold man (4 R.R. 204-06). Thus, R.M. was using deception in her allegations.

c. When Mrs. Bell learned that the man lived in Michigan, she concluded that R.M. was lying about Bell because earlier R.M. had asked about going to school in Michigan without explaining why (4 R.R. 210-11). Thus, R.M. was engaged in a conspiracy with Mason.

d. Ultimately, Laura Bell sent R.M. to the Methodist Children's Home in Waco Texas, in the hope that R.M. would receive counseling for chatting online with sexual predators, being defiant, and lying (4 R.R. 253). Thus, R.M. was disobedient and incorrigible.

e. John Bell and Laura Bell married in 2003, when R.M. was six years old (4R.R. 67), and there were two other girls in the home who had not made allegations of sexual abuse against Bell. Thus, the allegation was out of context.

f. R.M. behaved poorly and spoke disrespectfully to her mother (4 R.R. 68). She took the family's computer into her bedroom, asserting that she needed

---

[53] *Id.* at 686 ¶ 23.

to use it to do her homework (4 R.R. 76-77). Thus, R.M. was deceitful.

g. Bell denied having any sexual contact with R.M. (4 R.R. 66-67). Thus, R.M. was lying.

h. Bell voluntarily talked to the authorities and voluntarily gave a saliva sample (4 R.R. 79-80), and; that Bell had cooperated with the police (5 R.R. 49). Thus, he had nothing to hide.

i. Defense counsel argued that R.M. had no physical trauma (5 R.R. 43). Thus, there was no physical evidence of the allegations.

j. R.M. said that Bell spit on his fingers the night before she made the accusations, but his DNA was not found in her, and she did not testify that she had cleaned herself (5 R.R. 43-45). Thus, the allegations were fabricated and lacked physical evidence.

k. Mason was grooming R.M. on the Internet (5 R.R. 37-38); and that she made good grades up until the time she met Mason (5 R.R. 47-48). Thus, the allegation was planted by Mason.

l. R.M. lied to her mother about her involvement with Mason (5 R.R. 48); and she asked her mother about going to boarding school in Michigan (5 R.R. 52). Thus, the allegations were a conspiracy of R.M. with Mason.[54]

The state habeas court concluded that Bell had not shown by a preponderance of the evidence that he was prejudiced by Garvie's performance or that he received ineffective assistance of counsel by Garvie not calling Dr. Johnson to testify and found that there is no reasonable probability that the result of the trial would have been different absent the alleged deficient performance of Mr. Garvie.[55]

A review of the record confirms that the trial court's findings and conclusions are supported by the record at trial and the habeas corpus hearing.  As explained in part

---

[54] *Id.* at 686-87 ¶ 26.
[55] *Id.* at 688 ¶¶ 32-33.

IV.A.1., *supra*, the habeas court's determination that the lab report was not false or misleading was not an unreasonable determination based on the state court record. Further, as previously explained, the state habeas court also found that the DNA reports reflect that no DNA from Bell was found on any evidentiary sample, and that fact was presented to the jury in the parties' Stipulation of Evidence.

Likewise, as discussed above in part IV.A.3, *supra*, Garvie attacked R.M.'s credibility on several fronts and had a coherent defensive strategy regarding Patrick Mason providing a motive to lie about the abuse. The state habeas court found that Garvie had a sound tactical strategy and further found that Bell did not show that the result of his trial would have been different if Garvie had been able to impeach R.M.'s testimony that she had not been sexually active with anyone besides Bell before her outcry. These determinations of the facts are not unreasonable based on the evidence in the record.

In addition, the state court's finding that Garvie rendered reasonably effective assistance of counsel is not an unreasonable application of *Strickland*. There, the Supreme Court emphasized, "[j]udicial scrutiny of counsel's performance must be highly deferential" and that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." 466 U.S. at 689 (citations omitted). It later noted that a state court's conclusion that trial counsel was not ineffective for failing to present blood expert investigation and testimony was not unreasonable, because "*Strickland*,

however, permits counsel to 'make a reasonable decision that makes particular investigations unnecessary.'" *Harrington*, 562 U.S. at 106-07 (holding that the state habeas court's determination that trial counsel was not ineffective for failing to investigate and present expert testimony on certain blood evidence because it was "well within the bounds of a reasonable judicial determination for the state court to conclude that defense counsel could follow a strategy that did not require the use of experts regarding the pool in the doorway of [one of the victim's] bedroom").

In *Harrington*, the Supreme Court found that "it is at least arguable that a reasonable attorney could decide to forgo inquiry" into an investigative path in the circumstances of that case. *Id.* Likewise, it was "at least arguable" that Garvie could decide that entering a Stipulation of Evidence that was favorable to Bell, instead of presenting his DNA expert to testify, was reasonable given the circumstances of this case, where the defense had an alternate sexual interest it could point to in Patrick Mason, there was no DNA of Bell's in the evidentiary samples, and the State was not presenting the DPS analyst to testify. Given the "wide latitude" state courts have in determining whether trial counsel made a reasonable tactical decision, *id.* at 106, the state habeas court reasonably determined that Garvie used a reasonable defense strategy that R.M. fabricated the allegations so she could be with Patrick Mason in Michigan and that the Stipulation of Evidence made further DNA expert investigation and testimony unnecessary. In addition, Bell does not show that Garvie's tactical decisions regarding his defensive strategy, in which he presented the Stipulation of Evidence in lieu of DNA expert testimony, caused him actual prejudice.

Under the doubly deferential review this federal court applies to ineffective assistance of counsel claims under *Strickland, Harrington*, and AEDPA, Bell does not meet his burden to show that his trial counsel rendered ineffective assistance in this case. Therefore, Bell is not entitled to habeas relief on his claims in Ground Two.

### C.    Cumulative Prejudice (Ground Three)

Bell claims that the cumulative effect of the errors prejudiced him. The state habeas court concluded that the errors, if any, from the lab report, the testimony, and defense counsel's trial strategy did not cumulatively undermine the confidence in the verdict.[56] Federal habeas relief is only available for cumulative errors that are of a constitutional dimension. *See Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007) (citing *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997); *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993)). As previously discussed, Bell has not established that the state court's determination that he failed to show prosecutorial misconduct or ineffective assistance of counsel was based on an unreasonable application of the facts or Supreme Court precedent. Nor does he show that the state court's determination that there was no cumulative error was contrary to, or an unreasonable application of Supreme Court precedent or the facts based on the record. Because he has not identified errors of constitutional dimension, the petitioner has failed to show that the state habeas corpus court's rejection of his cumulative-error claim was objectively unreasonable. *See Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (noting that "claims that are not prejudicial cannot be cumulated, regardless of

---

[56] Doc. No. 8-26 at 82, SHCR at 689 (Conclusions of Law on Material Fact Issue Number 5).

the total number raised"); *United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006) ("Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions."); *Yohey*, 985 F.2d at 229 (stating that, because certain alleged errors were not of constitutional dimension and because others were meritless, the petitioner had "presented nothing to cumulate"). Therefore, Bell does not show that he is entitled to federal habeas relief on Ground Three.[57]

## V.   **CERTIFICATE OF APPEALABILITY**

Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner. *See* 28 U.S.C. § 2253. A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard*, 542 U.S. at 282 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Under the

---

[57] Bell recently submitted an "Advisory" regarding a *state habeas* case where the manslaughter conviction was set aside by the *state court* because that court found that trial counsel was ineffective for not adequately investigating the DNA evidence. *See* Doc. No. 9 (Advisory attaching Findings of Fact and Conclusions of Law in *McGuffin v. Nooth*, Case No. 15CV1030 (Malhuer Cnty. Ore. Nov. 26, 2019)). *McGuffin* is readily distinguishable from the instant case. *McGuffin* concerned a favorable determination for the petitioner by the state court, whereas this case involves a state court finding that was unfavorable to Bell that is now subject to deference under the AEDPA on federal habeas review. Another glaring difference is that the manslaughter victim in *McGuffin* did not (and, of course, could not) testify and identify McGuffin as her assailant, and identity of the assailant was at issue in that case. In sharp contrast, R.M. testified at trial, identifying Bell as her abuser and providing specific details of continuous sexual abuse over many years. As explained above, Bell does not meet his burden to overcome the deference afforded to that adverse state determination on *federal review* of trial counsel's performance under the AEDPA, *Strickland*, and other Supreme Court precedent.

controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). For reasons set forth above, the Court concludes that jurists of reason would not debate whether the Court's ruling in this case was correct. Therefore, a certificate of appealability will not issue.

## VI.   CONCLUSION AND ORDER

Based on the foregoing, the Court **ORDERS** as follows:

1.     The respondent's motion for summary judgment (Doc. No. 6) is **GRANTED,** and this habeas corpus petition is **DISMISSED** with prejudice.

2.     All other pending motions, if any, are **DENIED.**

3.     A certificate of appealability is **DENIED.**

The Clerk shall provide a copy of this order to the parties.

SIGNED at Houston, Texas, this ___ / 5 ___ day of September 2022.

ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE